# In the United States Court of Federal Claims

No. 24-914 C
(Filed Under Seal: September 30, 2024)
Reissued: October 24, 2024[*]

```
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
                                              *
                                              *
ACUITY EDGE, INC.,                            *
                                              *
                      Plaintiff,              *
                                              *
          v.                                  *
                                              *
THE UNITED STATES,                            *
                                              *
                      Defendant,              *
                                              *
SUMMIT TECHNOLOGIES &                         *
SOLUTIONS, INC.,                              *
                                              *
                Defendant-Intervenor.         *
                                              *
                                              *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

*W. Brad English*, with whom were *Emily J. Chancey* and *Taylor R. Holt*, Maynard Nexsen PC, all of Huntsville, Al., for Plaintiff.

*Stephen J. Smith*, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were *Elizabeth M. Hosford*, Assistant Director, *Patricia M. McCarthy.*, Director, and *Brian M. Boynton*, Principal Deputy Assistant Attorney General, all of Washington, D.C., for Defendant, and *Jennifer L. Howard*, Senior Attorney, of Washington, D.C., *Vince Vanek*, Assistant Chief Counsel, and *Kristin Pollard Kiel*, Attorney Advisor, Office of the General Counsel, National Aeronautics and Space Administration, of Marshall Space Flight Center, Al., of counsel.

*Damien C. Specht*, with whom were *James A. Tucker*, and *Caitlin A. Crujido*, Morrison & Foerster LLP, all of Washington, D.C., for Defendant-Intervenor.

---

[*] Pursuant to the protective order entered in this case, this opinion was filed initially under seal. The parties provided proposed redactions of confidential or proprietary information, which are redacted in this version of the opinion.  In addition, the Court made minor typographical and stylistic corrections to this version of the opinion.

<u>**OPINION AND ORDER**</u>

**SOMERS,** Judge.

In this protest, the protestor, Acuity Edge, lodges two principal challenges to the agency's evaluation of proposals. As discussed in detail below, these challenges relate to the evaluation of past performance references and a strength the protestor alleges should have been awarded for its staffing plan. Before reaching these two challenges, though, Acuity must demonstrate that it should have been eligible for award and thus has standing to protest the procurement errors it alleges. For the reasons discussed below, the Court finds that Acuity has failed to demonstrate standing.

**BACKGROUND AND PROCEDURAL HISTORY**

**A.     Solicitation**

At issue in this case is a National Aeronautics and Space Administration ("NASA") Indefinite-Delivery Indefinite-Quantity ("IDIQ") contract "to provide program support for the Space Technology Mission Directorate (STMD) Technology Transfer Program (T2P)." ECF No. 28 at 1–2 ("Pl.'s MJAR"). The solicitation was issued "as a 100% HUBZone set aside under FAR Part 15 and NSF Part 1815." *Id.* at 1 (citing AR 859). The T2P's mission is to "identify and protect . . . [NASA's] intellectual property with commercial potential and transfer those technologies through patent licensing agreements, software usage agreements, and related technology transfer partnerships with entrepreneurs, companies, universities, non-profits, business incubators and innovation ecosystems, and state and local governments." Administrative Record ("AR") 951. The awardee will provide program support for T2P at NASA headquarters, the Marshall Space Flight Center, and Stennis Space Center, as well as have the potential for support at other NASA field centers. AR 859.

NASA intended this award to "be conducted utilizing a best value tradeoff between the factors of Mission Suitability, Price, and Past Performance" in accordance with the Federal Acquisition Regulation ("FAR"). AR 1102. All three factors were equally important when compared to each other, but the combined non-price factors, Mission Suitability and Past Performance, were significantly more important than Price. AR 1153–54. The Mission Suitability evaluation criteria contained two subfactors: technical approach and management and compensation approach. AR 1154–55. Both subfactors contained various additional evaluation elements that NASA would use in evaluating the proposals.[1] *Id.*

Past Performance would be evaluated for both offerors and proposed subcontractors on a scale ranging from Very High Level of Confidence to Neutral Confidence. AR 1158–59. The

---

[1] For Technical Approach, the additional elements were TA-1 Technical Approach, TA-2 Technology, Innovations, and Process Improvements, and TA-3 Technical Risk Approach. AR 1154. For Management and Compensation Approach, the additional elements were MCA-1 Management and Total Compensation Approach, MCA-2 Business Approach, MCA-3 Organizational and Teaming Structure, MCA-4 Contract Phase-In and Phase-Out Approach, and MCA-5 Management and Compensation Risk Approach. AR 1155.

solicitation informed offerors to provide up to five contract references for the offeror and proposed subcontractors, at least two of which must be from the offeror. AR 1118. NASA's confidence evaluation would be based on its analysis of "each referenced contract's 'size, content, and complexity, and performance history (i.e., quality of Past Performance).[']" ECF No. 29 at 4 ("Gov.'s MJAR") (citing AR 1157–59). In order to be evaluated by NASA, the referenced contracts had to be "relevant in either size, content, or complexity." AR 1157. If a referenced contract was not relevant in one of those categories, "it [would] be determined not relevant overall and [would] not be further evaluated." *Id.* In terms of size, "[f]or offerors, a referenced contract will be determined relevant if it has an average annual value of $500,000 or greater, and for proposed subcontractors, an average annual value of $200,000 or greater." AR 1118. To be relevant for content, the evaluation of an offeror's contracts will be based on how well they aligned with the relevant performance work statements and for proposed subcontractors "relevancy will be determined relative to the content element(s) assigned to that subcontractor." AR 1118–19. "The [] Solicitation did not set out separate complexity requirements for the offeror and subcontractor reference contracts." Gov.'s MJAR at 5 (citing AR 1119).[2]

Recognizing this discrepancy, the Source Evaluation Board ("SEB") issued a memorandum to correct this error. AR 4372. On March 21, 2024, the memorandum documented the rationale to update the Source Evaluation Plan ("SEP") stating that the plan "included separate offeror and subcontractor thresholds for Size and Content, but Complexity was inconsistent in that it lacked a separate subcontractor threshold. To correct for this inconsistency, the SEB updated the SEP to include subcontractor thresholds for Complexity." *Id.* The memorandum further noted that "these SEP changes are *strictly internal* and will allow the Government to better assess complexity." AR 4373 (emphasis added).

According to the solicitation, "[c]onsistency between the Mission Suitability factor and the Price factor volumes will be considered in determining if the offeror's proposed price is fair and reasonable." AR 1156. And total price was to be "the sum of (1) the phase-in services price; (2) the mission core services price for the contract period of performance, including all options; and (3) an indefinite-delivery, indefinite-quantity (IDIQ) price using the offeror-provided fully burdened rates applied to a pre-populated estimate of labor hours for each labor category . . . ." AR 1157. Additionally, and critically for purposes of this protest, in order to be eligible for the award, the solicitation required offers to "remain in effect not less than 365 days after the date specified for receipt by the Government." AR 1125. Finally, NASA intended to issue this award without discussions. AR 1092. NASA did, however, provide itself with the

---

[2] Instead, it stated:

For the offeror, to be considered relevant for complexity, the referenced contract shall demonstrate performance at a single geographic location and success handling a moderate (i.e., 1,250 or more work products annually) volume of work products processed, developed, and delivered simultaneously or performance at multiple geographic locations and success at handling a small (i.e., 800 or more work products annually) volume of work products processed, developed, and delivered simultaneously.

AR 1119.

ability to conduct exchanges with an offeror concerning its Organizational Conflict of Interest ("OCI") Plan.  AR 1153.  This provision stated:

> Additional requirements for eligibility have been established for this acquisition. The Government may communicate with offerors about the eligibility requirement(s) identified below outside of the evaluation process. This communication does not constitute discussions as defined in FAR 15.306. If the following eligibility requirements cannot be made acceptable to the Government, the offeror will be considered ineligible for award:
>
> > Organizational Conflict of Interest (OCI) Plan in accordance with the Notice of Potential Organizational Conflicts of Interest in Section L and FAR 9.504. The proposed OCI plan shall be consistent with all other areas of the proposal. Material inconsistencies between the plan and other proposal areas may render the proposal invalid, resulting in an unacceptable proposal that is ineligible for award.

*Id.*

## B.    Offers and Award Decision

In response to the solicitation, NASA received proposals from three offerors: Summit Technologies & Solutions, Inc. ("Summit"), EN4S, and Acuity Edge ("Acuity").  AR 4617.  The below chart summarizes NASA's evaluation of the proposals:

| Offeror | Mission Suitability | Price | Past Performance |
|---------|--------------------|-------|------------------|
| **Summit** | Score: 655<br><br>Technical Approach – "Good"<br><br>Management & Compensation Approach – "Good" | Lowest | Very High Confidence |
| **EN4S** | Score:  525<br><br>Technical Approach – "Good"<br><br>Management & Compensation Approach "Fair" | Highest | High Confidence |
| **Acuity** | Score: 605<br><br>Technical Approach – "Good"<br><br>Management & Compensation Approach – "Good" | Middle | Very High Confidence |

Gov.'s MJAR at 10.

4

The Source Selection Authority ("SSA") reviewed and compared the offers and awarded the contract to Summit.  AR 4622–31.  According to the SSA, this was because "based on [his] integrated assessment of all three proposals and in accordance with the evaluation criteria and their relative importance established for the [solicitation], . . . the Summit proposal offered advantages over the Acuity Edge proposal under the Mission Suitability and Price factors (with the proposals considered essentially equal under the Past Performance factor) and advantages over the EN4S proposal under all three factors."  AR 4631.  Accordingly, he "determined the Summit proposal represents the best value to the Government" and awarded the contract to Summit.  *Id.*  Moreover, the SSA noted that "Acuity Edge's proposal is ineligible for contract award because its offer expired 60 calendar days from the date for receipt of offers."  AR 4627.  The solicitation provided that "[o]ffers submitted in response to this solicitation shall remain in effect not less than 365 days after the date specified for receipt by the Government.  However, in accordance with FAR 52.215-1, a different (longer) validity period may be proposed."  AR 1125.  The SSA nonetheless comparatively assessed Acuity's proposal "for the purpose of providing Acuity Edge meaningful insight on how its proposal compared to the STS proposal in the event discussions were conducted."  AR 4627.

## C.    Acuity Protests the Award to Summit

Acuity protests NASA's award decision on three grounds.  First, Acuity alleges that NASA had discussions with Summit and because it had those discussions with Summit it was required to have them with Acuity as well.  Pl.'s MJAR at 12.  Acuity, at oral argument, acknowledged that if it was unsuccessful in convincing the Court on this point, then Acuity would lack standing to challenge the protest.[3]  Acuity challenges NASA's exchanges with Summit regarding its OCI plan as "exceed[ing] the bounds of the Solicitation's exception to the general discussions rule."  Pl.'s MJAR at 13.  Critically, Acuity did not "challenge the Solicitation provision that allowed these types of communications."  *Id.* at 13, n.2.  Rather, Acuity argues "[t]he Solicitation's exception only extended to communications with offerors about inconsistencies between the OCI plan and the rest of the offeror's proposal."  *Id.* at 13.  Acuity further argues that the language "Organizational Conflict of Interest (OCI) Plan in accordance with the Notice of Potential Organizational Conflicts of Interest in Section L and FAR 9.504[,]" AR 1153, is a header and the following two sentences "are specifics that are meant to modify the general statement that introduces the paragraph."  Pl.'s MJAR at 13.  Therefore, according to Acuity, NASA's exchange with Summit, which instructed it to make two revisions to its OCI plan, exceeded the scope of the clause because the first change was not about inconsistencies between Summit's OCI plan and its proposal, but instead about "an inconsistency between Summit's OCI plan and the Solicitation."  *Id.* at 14 (emphasis omitted).  Moreover, Acuity asserts that the second change was about adding additional information into the OCI plan,

---

[3] The Court stated "[a]s I take it, . . . I don't think there's a standing issue to raise the OCI issue, but if you were unsuccessful in persuading me that you are correct on the OCI issue, you would not have standing to raise the past performance and 100 percent agency capture issue.  That's how I look at it . . . ."  Tr. 4:7–4:12.  To which Acuity responded, "I agree with that. . . .  We've raised the discussions/OCI issue because we think it gives us the opportunity to cure the defect in our proposal, and if [the Court] disagrees with us, then we have an unawardable proposal, and, I assume, that would be the end of it."  *Id.* 4:14–4:20.

and it did not "address inconsistencies between Summit's OCI plan and the rest of its proposal." *Id.* at 15. Thus, Acuity argues, this constituted discussions under the FAR, which required NASA to have discussions with Acuity to cure its eligibility issue. *Id.* at 15–16.

Second, Acuity challenges the decision by NASA to create "a separate complexity requirement and judge[] subcontractor references against it based on a purported 'inconsistency.'" *Id.* at 17–18. Instead, Acuity argues "[t]his was a change, but [NASA] did not amend the Solicitation or allow offerors to submit bids in response to it." *Id.* at 18. Acuity believes this prejudiced it because the new criteria was so different from the solicitation that Acuity likely would have either submitted another reference or additional references that would have likely resulted in a newly assigned strength—tipping the award in its favor. *Id.* at 18–19. Third, Acuity argues NASA "unreasonably refused to award Acuity a strength for ████ incumbent capture." *Id.* at 19. Acuity asserts that it already had ████████████ and informed NASA that it would "████████████████████████." *Id.* at 20 (citing AR 1250–51). Acuity's belief is that its demonstrated ability to hire the team fits "at least the definition of a strength, and likely a significant strength." *Id.* In support of its argument, Acuity points to a sole evaluator who "recognized that Acuity deserved a Management and Compensation Approach Strength for its ████ incumbent capture plan." *Id.* at 21 (citing AR 4141). Acuity argues the "SEB decided to take that strength away 'after discussion.'" *Id.* But "[t]he record offers no other explanation for NASA's decision to withdraw this obvious strength." *Id.* This, according to Acuity, is irrational. *See id.* at 21. But for these errors, Acuity believes it would have been "within the zone of active consideration" for award of the contract. *Id.* at 25.

On August 28, 2024, the Court held oral argument on the pending motions, and the matter is now ripe for consideration.

## DISCUSSION

### A.   Article III's Standing Requirement

Standing, as defined by the Supreme Court, "is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). While this Court "is established under Article I of the Constitution, . . . it 'applies the same standing requirements enforced by other federal courts created under Article III." *Land Shark Shredding, LLC v. United States*, 842 F. App'x 594, 596 (Fed. Cir. 2021) (quoting *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009)); *see also Freytag v. Commissioner of Internal Revenue*, 501 U.S. 868, 889 (1991) ("[N]on-Article III tribunals . . . exercise the judicial power of the United States."). The "irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). First, a plaintiff must show that it suffered an injury in fact that is both "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical.'" *Id.* Second, the injury must be "fairly . . . trace[able] to the challenged action of the defendant, and not … th[e] result [of] the independent action of some third party not before the court." *Id.* at 560–61 (alterations in original) (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). Third, and finally, the injury must be "likely" to be "redressed by a favorable decision."

*Id.* at 561 (quoting *Simon*, 426 U.S. at 38).  Moreover, because standing is not a mere pleading requirement, "but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.*; *see also Starr Int'l Co., Inc. v. United States*, 856 F.3d 953, 964 (Fed. Cir. 2017) ("The plaintiff bears the burden of showing standing . . . .").

At issue in this case, as it relates to standing, is the redressability requirement.  "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998).  In other words, redressability requires a showing "that prospective relief will remove the harm." *Warth v. Seldin*, 422 U.S. 490, 505 (1975).  Therefore, a plaintiff must show that it "would benefit in a tangible way from the court's intervention." *Id.* at 508.  Stated differently, if, for example, after the undoing of the government action the status quo remains in place, the alleged injury is not redressable.  *See Renal Physicians Ass'n v. United States HHS*, 489 F.3d 1267, 1278 (D.C. Cir. 2007) ("In sum, RPA has not satisfied the redressability prong of the standing requirement, because it has not alleged any facts showing that an order invalidating the safe harbor will likely cause dialysis facilities to increase the wages of RPA members.").

Critically, although Article III's standing requirements "are jurisdictional in a broad sense, they are more accurately characterized as prerequisites to subject matter jurisdiction." *Superior Waste Management LLC v. United States*, 169 Fed. Cl. 239, 252–53 (2024) (collecting cases).  Accordingly, without satisfying these three prongs, the Court cannot adjudicate the matter before it, because if the Court were to adjudicate such a claim, it would be "exceed[ing] its] authority as it has been traditionally understood." *Spokeo, Inc.*, 578 U.S. at 338 (citing *Raines v. Byrd*, 521 U.S. 811, 820 (1997)).  In short, "[t]o establish a case or controversy, a party invoking federal jurisdiction must meet the 'irreducible constitutional minimum of standing.'" *Allgenesis Biotherapeutics Inc. v. Cloudbreak Therapeutics, LLC*, 85 F.4th 1377, 1380 (Fed. Cir. 2023) (quoting *Lujan*, 504 U.S. at 560).

## B.    Bid Protest Jurisdiction

The Tucker Act, as amended by the Administrative Dispute Resolution Act, provides the Court of Federal Claims with "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement . . . ." 28 U.S.C. § 1491(b)(1).  In such actions, the Court "shall review the agency's decision pursuant to the standards set forth in section 706 of title 5." 28 U.S.C. § 1491(b)(4).  "A bid protest proceeds in two steps." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005).  First, a protestor must demonstrate error, meaning that the agency violated section 706 of the Administrative Procedure Act.  *Id.*; *see also* 5 U.S.C. § 706(2)(A) (requiring the reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be—arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . ."). Second, such error must prejudice the protestor.  *Bannum, Inc.*, 404 F.3d at 1351.

"A government contract award may be set aside as erroneous under the arbitrary and capricious standard if '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *McVey Co. Inc. v. United States*, 111 Fed. Cl. 387, 402 (2013) (quoting *Weeks Marine, Inc.*, 575 F.3d at 1358). To show an agency acted arbitrarily or capriciously, a protestor must show the agency "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "When a challenge is brought on the second ground, the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001) (quoting *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

But error alone is not enough; prejudicial error to the protestor is required to set aside an award. *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 908 (Fed. Cir. 2013). "[T]here is no presumption of prejudice when a protestor demonstrates irrationality in an agency decision." *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 998 (Fed. Cir. 2021). To establish prejudice, a protestor "must show that there was a substantial chance it would have received the contract award but for the alleged error in the procurement process." *REV, LLC v. United States*, 91 F.4th 1156, 1163 (Fed. Cir. 2024) (internal citations and quotations omitted). In order to show it had a substantial chance to receive the contract, the protestor must show "that it is a qualified bidder and could *compete* for the contract." *Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1360 (Fed. Cir. 2015). Stated differently, "the protestor's chance of securing the award must not have been insubstantial." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003).

Bid protests are generally decided on cross-motions for judgment on the administrative record, pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"). RCFC 52.1 requires that the Court "make factual findings from the record evidence as if it were conducting a trial on the record." *Bannum, Inc.*, 404 F.3d at 1354. Unlike a motion for summary judgment, a genuine dispute of material fact does not preclude a judgment on the administrative record. *See id.* at 1355–56. Therefore, in reviewing cross-motions for judgment on the administrative record, "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *Jordan Pond Co., LLC v. United States*, 115 Fed. Cl. 623, 630 (2014).

## C.    Acuity Has Not Established That It Has Standing Because the Agency's OCI-Related Exchanges with Summit Did Not Exceed the Solicitation's Terms

The solicitation provided that "[o]ffers submitted in response to this solicitation shall remain in effect not less than 365 days after the date specified for receipt by the Government." AR 1125. It is undisputed that Acuity's proposal only reflected 60 days of validity and that Acuity's proposal was thus ineligible for award unless Acuity was permitted to modify its proposal. It is also undisputed that unless Acuity can demonstrate to the Court that it should

have been permitted to fix this pricing issuing, Acuity does not have standing to challenge the alleged errors in the procurement process that Acuity claims prejudiced it. *See* note 3 *supra*. In order to get around its eligibility (and thus standing) problem, Acuity asserts that NASA was required to conduct discussions with Acuity and that, through those discussions, Acuity could have easily addressed its eligibility problem.

Although an agency is not generally required to conduct discussions, if an agency does conduct discussions, it must do so with all offerors. FAR 15.306(d)(1) (requiring that once discussions are initiated, they "must be conducted by the contracting officer with each offeror within the competitive range."). Acuity claims that the exchanges NASA had with Summit regarding Summit's OCI plan constituted discussions; therefore, NASA also had to have discussions with Acuity. The key to this argument for Acuity is proving that the exchanges between NASA and Summit regarding Summit's OCI plan fall outside of the provision in the solicitation that provided that NASA could have exchanges with an offeror about the offeror's OCI plan. Recall, this OCI plan carve-out language states that:

> Additional requirements for eligibility have been established for this acquisition. The Government may communicate with offerors about the eligibility requirement(s) identified below outside of the evaluation process. This communication does not constitute discussions as defined in FAR 15.306. If the following eligibility requirements cannot be made acceptable to the Government, the offeror will be considered ineligible for award:

>> Organizational Conflict of Interest (OCI) Plan in accordance with the Notice of Potential Organizational Conflicts of Interest in Section L and FAR 9.504. The proposed OCI plan shall be consistent with all other areas of the proposal. Material inconsistencies between the plan and other proposal areas may render the proposal invalid, resulting in an unacceptable proposal that is ineligible for award.

AR 1153.

At first glance, this provision appears to run afoul of the FAR, because any exchanges between NASA and an offeror that allow the offeror to revise its proposal would seem to be in direct conflict with FAR § 15.306.[4] Under the FAR, if an award is intended to be made without discussions, only limited exchanges are permitted. These limited exchanges, called "clarifications," allow offerors "the opportunity to clarify certain aspects of proposals . . . or to resolve minor or clerical errors." 48 C.F.R. § 15.306(a)(2). But "clarifications" do not allow for proposal revisions. However, the solicitation's carve-out clearly allows for proposal revisions in order to enable "eligibility requirements [to] be made acceptable to the Government." AR 1153. Here, the only eligibility requirement covered by the carve-out was the OCI Plan, and allowing an offeror to revise its OCI plan was certainly not a "minor or clerical error" as defined in FAR §

---

[4] This provision appears to be a deviation as defined by the FAR. *See* 48 C.F.R. § 1.401. If that is the case, the Administrative Record does not make clear if the procedures for deviations, both individual and class deviations, were followed. *See* 48 C.F.R. §§ 1.403, 1.404.

15.306(a)(2).  Instead, NASA reached out to Summit to have it make the following revisions to its OCI Plan:

> (1) Remove references to Section H.2 Clause, Limitation of Future Contracting, as this clause was not included in the solicitation.  Further, in those areas which relied on references to this clause, make revisions such that the OCI Plan remains in compliance with solicitation requirements.

> (2) Provide further detail on how Summit will firewall employees with access to sensitive information from others within the company, including measures it will use to ensure that employees with access to sensitive information do not participate on proposal teams for competitions in which the information would be competitively useful.

AR 4567.  Such revisions exceed what the FAR permits under clarifications and, because a competitive range was not established, are also not covered by either of the other two categories of exchanges permitted by FAR § 15.306: communications and discussions.  *See* 48 C.F.R. §§ 15.306(b) & (d).

Although the carve-out likely exceeds the exchanges permitted by the FAR (and there is no evidence that the procedures for a deviation were followed, *see* note 4 *supra*), Acuity did not protest NASA's authority to include the carve-out as a provision in the solicitation.  Quite the opposite; Acuity expressly waived the argument in its MJAR.  *See* Pl.'s MJAR at 13 n.2 ("In an abundance of caution, and to avoid a debate later, Acuity is not challenging the Solicitation provision that allowed for these types of communications."); *see also CardSoft v. Verifone, Inc.*, 769 F.3d 1114, 1119 (Fed. Cir. 2014) ("Arguments that are not appropriately developed in a party's briefing may be deemed waived.").  As such, the propriety of the carve-out *vis-à-vis* the FAR is not at issue in this protest.

But what Acuity does challenge is how the carve-out was applied during this procurement.  Acuity's argument unfolds into two steps.  First, Acuity argues that the exchanges between Summit and NASA went beyond the scope of the carve-out because NASA's "communications about Summit's OCI plan did not address inconsistencies between the plan and the rest of Summit's proposal."  Pl.'s MJAR at 14.  Acuity's position is that the "[t]he Solicitation's exception only extended to communications with offerors about inconsistencies between the OCI plan and the rest of the offeror's proposal."  *Id.* at 13 (citing AR 1153).  Acuity argues that the first sentence—"Organizational Conflict of Interest (OCI) Plan in accordance with the Notice of Potential Organizational Conflicts of Interest in Section L and FAR 9.504[,]" AR 1153—is a header and the next sentences "are specifics that are meant to modify the general statement that introduces the paragraph."  Pl.'s MJAR at 13 (citing *Dow Chem Co. v. Nova Chems. Corp. (Can.)*, 458 F. App'x 910, 914 (Fed. Cir. 2012)).  Acuity argues the exchanges and revisions proposed by NASA to Summit's OCI plan were not about inconsistencies between Summit's proposal and its OCI plan but rather were 1) about "an inconsistency between Summit's OCI plan and the Solicitation . . . [and 2) a request] for additional information to be included in the OCI plan."  *Id.* at 14–15 (emphasis omitted).  Therefore, according to Acuity,

these requests regarding Summit's OCI plan were not covered by the carve-out and thus constituted discussions governed by FAR § 15.306(d). *See id.*

Second, Acuity argues that because the exchanges between NASA and Summit regarding Summit's OCI plan were, in fact, discussions, Acuity was entitled to discussions as well. As Acuity notes "[i]t is well settled that the government may not hold discussions with just one offeror." *Id.* at 15. (citing *ENGlobal Gov't Servs., Inc. v. United States*, 159 Fed. Cl. 744, 765 (2022); *Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 361 (2009); *Info. Tech. & Applications Corp.*, 316 F.3d at 1318)). Acuity represents that if it had been given the chance to have discussions it would have been able to cure its eligibility issue by correcting the expiration date of its offer. Acuity, citing *Carahsoft Tech. Corp. v. United States*, 86 Fed. Cl. 325, 341–42 (2009), argues that NASA "was required to raise [Acuity's validity date eligibility issue] in discussions, and [that it was] something Acuity could easily cure." Pl.'s MJAR at 15. NASA even seemed to acknowledge as much: "[w]ere discussions determined to be necessary and were the Acuity Edge proposal determined to be one of the most highly rated proposals, Acuity Edge would have had an opportunity as part of its final proposal revision to extend the validity date of its proposal." AR 4872.

Unfortunately for Acuity, its argument fails on the first step. The language of the carve-out does not limit the covered exchanges to only inconsistencies between an offeror's OCI plan and the rest of its proposal. Rather, there is only one reasonable reading of the provision, which is to place exchanges between NASA and an offeror about an offeror's OCI plan outside of the realm of discussions. *See* ECF No. 33 at 3–4. Specifically, the provision provides that NASA "may communicate with offerors about the eligibility requirement(s) identified below outside of the evaluation process" and that such a "communication does not constitute discussions as defined in FAR 15.306." AR 1153. The only eligibility requirement identified in the solicitation was the OCI plan: "Organizational Conflict of Interest (OCI) Plan in accordance with the Notice of Potential Organizational Conflicts of Interest in Section L and FAR 9.504." *Id.* Thus, under the terms of the carve-out, NASA's exchanges with Summit concerning Summit's OCI plan did not constitute discussions.[5]

---

[5] Defendant-Intervenor argued that "Plaintiff's interpretation conflicts with FAR 9.504 . . . [which] specifically permits one-on-one exchanges with an offeror to discuss OCI concerns and adjust mitigation, ***without*** constituting the opening of discussion and without limitation[.]" ECF No. 30 at 3 (emphasis in original). Defendant-Intervenor misreads the FAR. FAR 9.504(e) states:

> The contracting officer shall award the contract to the apparent successful offeror unless a conflict of interest is determined to exist that cannot be avoided or mitigated. Before determining to withhold award based on conflict of interest considerations, the contracting officer shall notify the contractor, provide the reasons therefor, and allow the contractor a reasonable opportunity to respond. If the contracting officer finds that it is in the best interest of the United States to award the contract notwithstanding a conflict of interest, a request for waiver shall be submitted in accordance with 9.503. The waiver request and decision shall be included in the contract file.

48 C.F.R. § 9.504(e). This section is only applicable upon two things happening: 1) a determination of an apparent successful offeror, and 2) a finding of a conflict of interest. *Id.*; *see also A Squared Joint*

Acuity attempts to get around this reading of the carve-out by asserting that the two sentences that follow the OCI plan language limit what aspects of an OCI plan are covered by the carve-out. Immediately following the sentence that Acuity calls a header (quoted above), the solicitation states that "[t]he proposed OCI plan shall be consistent with all other areas of the proposal. Material inconsistencies between the plan and other proposal areas may render the proposal invalid, resulting in an unacceptable proposal that is ineligible for award." *Id.* According to Acuity, these two sentences limit the exchanges NASA could have with an offeror about an OCI plan to exchanges regarding inconsistencies between an offeror's OCI plan and its proposal. Acuity's reading is unreasonable.

As the government points out in its reply brief, the only reasonable reading of the sentences that Acuity references is that those two sentences outline "the consequence for offerors should their revisions to the OCI Plan create inconsistencies with other areas of their proposal." ECF No. 33 at 4. In other words, the sentences are a warning to offerors not to make changes to their OCI plans that are inconsistent with their proposals during the course of any OCI plan exchanges with NASA because any inconsistencies may make their proposals ineligible for award. For several reasons, these sentences cannot reasonably be interpreted as a limit, as Acuity argues, on what aspects of an OCI plan about which NASA could reach out to an offeror. First, these exchanges were to occur "outside of the evaluation process." *Id.* If the exchanges were occurring outside of the evaluation process, NASA would not be concerned with what was in an offeror's proposal. But that is precisely what Acuity argues these exchanges are limited to—an offeror's proposal and whether that proposal is consistent with the OCI plan. Second, Acuity's reading implies that not only could an offeror revise its OCI plan as part of these exchanges, but that it could revise its proposal as well if proposal revisions were needed to create consistency between the OCI plan and the proposal. Thus, Acuity's reading would effectively allow NASA to communicate with an offeror about any aspect of an offeror's proposal so long as that aspect related in some way to the OCI plan. This is an unreasonably expansive reading of the carve-out. Third, Acuity's reading makes much of the verbiage in the sentence it calls a "heading" mere surplusage. *See Arizona v. United States*, 216 Ct. Cl. 221, 235–36 (1978) ("[A]n interpretation which gives a reasonable meaning to all parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result."). What is the purpose of the "heading" including the language "in accordance with the Notice of Potential Organizational Conflicts of Interest in Section L and FAR 9.504," if the carve-out is not intended to allow NASA to communicate with an offeror about issues that make its OCI plan *not* in accordance with the Notice of Potential Organizational Conflicts of Interest in Section L and FAR 9.504? If Acuity's reading were reasonable, then a header simply stating "Organizational Conflict of Interest (OCI) Plan" would both make more sense and avoid the inclusion of unnecessary verbiage. Fourth, Acuity's interpretation makes the third sentence of the carve-out surplusage as well. The third sentence states that "[m]aterial inconsistencies between the plan and other proposal areas may render the

_____

*Venture v. United States*, 136 Fed. Cl. 321, 328 (2018) ("FAR § 9.504(e) applies when an apparent successful offeror has been identified and the CO learns that the apparent successful offeror has OCI. If the OCI cannot be avoided or mitigated, the offeror can be eliminated.") At the time of the exchanges between NASA and Summit, neither of these prongs had been satisfied. Thus, FAR 9.504 does not apply.

proposal invalid, resulting in an unacceptable proposal that is ineligible for award." AR 1153. But the sentence from the carve-out leading into the OCI paragraph already states the same: "[i]f the following eligibility requirements cannot be made acceptable to the Government, the offeror will be considered ineligible for award." *Id.* Thus, if the Court were to adopt Acuity's reading, it would make these two sentences redundant.

In short, Acuity's reading of the carve-out is unreasonable. The only reasonable reading of the carve-out put before the Court by the parties is that the first sentence—"Organizational Conflict of Interest (OCI) Plan in accordance with the Notice of Potential Organizational Conflicts of Interest in Section L and FAR 9.504"—was a list item that listed OCI plans as a requirement that was covered by the carve-out and that the two sentences following this list item were a warning to offerors as discussed above. Any confusion regarding this reading is likely the result of this being a one-item list. But the language of the carve-out appears to be boilerplate language, which indicates that it could have been followed by more than one requirement. *Id.* (specifically, the language provides that "[t]he Government may communicate with offerors about the eligibility *requirement(s)* identified below" (emphasis added)).

Once Acuity's unreasonable reading of the carve-out is put aside, Acuity's assertion— that NASA conducted discussions with Summit regarding its OCI plan and thus was required to conduct discussion with Acuity as well—clearly fails. Rather than constituting discussions, NASA's exchanges with Summit regarding its OCI plan fell directly within the solicitation's carve-out. Acuity, therefore, was not entitled to discussions and its proposal remains ineligible for award. Accordingly, the alleged errors with NASA's evaluation of proposals are not redressable by the Court even if proved and thus Acuity lacks standing to challenge those alleged errors. "To determine whether an injury is redressable [the Court] consider[s] the relationship between the judicial relief requested and the injury suffered." *Murthy v. Missouri*, 144 S. Ct. 1972, 1995 (2024) (cleaned up) (quoting *California v. Texas*, 593 U.S. 659, 671 (2021)). Here, the relief requested cannot be granted. Even if the Court fully agreed with Acuity's arguments on past performance and incumbency capture rate, there is no redressable injury because Acuity remains ineligible for award. Any order from the Court directing NASA to change its ratings or redo its evaluation would have no effect on Acuity's chances of contract award. Even if proved, the alleged injuries are not redressable because the status quo would remain in place. *See Renal Physicians Ass'n*, 489 F.3d at 1278. Based on its pleadings, the only way for Acuity to have standing was for it to demonstrate that NASA was required to conduct discussions with all offerors in the competitive range, which in turn would have permitted Acuity to cure its eligibility issue. Only then would the Court's action on Acuity's additional arguments potentially lead to relief. But that is not the case. The government proffered a reasonable interpretation regarding the carve-out; the burden was on Acuity to convince the Court that its interpretation was also reasonable, and Acuity has failed to carry that burden. Thus, the Court cannot act. To act otherwise would be to overstep the bounds of the judicial power. *See Spokeo, Inc.*, 578 U.S. at 338. The Court declines to do so.

13

**D.     Even if Acuity Had Standing, it Did Not Demonstrate Prejudice with Regard to the Procurement Errors it Alleges**

Even had Acuity established that it had standing, Acuity's additional arguments suffer from several issues that likely would not entitle it to judgment on the administrative record in any event.  As Acuity has failed to establish standing, the Court will not address Acuity's merits arguments in total.  The Court will, however, offer some observations on the merits prejudice issues with Acuity's additional protest grounds.  Acuity alleges two main errors with regard to the procurement.  First, Acuity challenges NASA's decision to relax the complexity threshold for subcontractor past performance references.  Pl.'s MJAR at 16.  The complexity requirement stated:

> A referenced contract's complexity relevancy will be determined based on how well the complexity of the effort performed (e.g., performance across multiple geographic locations, volume and types of work products processed, developed, and delivered simultaneously) aligns with the effort delineated in Attachment J-1 and other pertinent sections of the solicitation. For the offeror, to be considered relevant for complexity, the referenced contract shall demonstrate performance at a single geographic location and success handling a moderate (i.e., 1,250 or more work products annually) volume of work products processed, developed, and delivered simultaneously or performance at multiple geographic locations and success at handling a small (i.e., 800 or more work products annually) volume of work products processed, developed, and delivered simultaneously.

AR 1119.  Acuity argues that it believed that all submitted references—both of the offeror and proposed subcontractors—had to meet the stated complexity threshold for offerors and submitted its past performance references based on that understanding. Pl.'s MJAR at 17.  However, NASA, during proposal evaluation, changed the complexity requirement to include a different complexity threshold for subcontractor references without amending the solicitation.  AR 4372.

Acuity is correct; NASA's actions likely were improper.  FAR 15.305(a) states "[a]n agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the Solicitation." 48 C.F.R. § 15.305(a).  Moreover, if NASA wanted to change its evaluation criteria, it was required to amend the solicitation to reflect the changed criteria.  48 C.F.R. § 15.206(a) ("When, either before or after receipt of proposals, the Government changes its requirements or terms and conditions, the contracting officer shall amend the solicitation.").  When an agency uses an unstated evaluation criterion, it acts irrationally.  *See Golden IT, LLC v. United States*, 165 Fed. Cl. 676, 686 (2023) ("An agency decision is also arbitrary and capricious if the decision is a product of the agency's application of unstated evaluation criteria.").  Here, NASA used an unstated evaluation criterion: the newly created subcontractor complexity threshold.[6]  Acuity, however, failed to demonstrate how the use of this unstated evaluation criterion prejudiced it.

---

[6] The government's argument on this point is unavailing.  The government argues for broad deference, Gov.'s MJAR at 19–20, arguing "[i]t is well settled that the solicitation need not identify criteria intrinsic to the stated evaluation factors, and agencies retain great discretion in determining the

Acuity admitted in its MJAR that "[it] understood [the complexity requirement] to mean that all references had to meet the stated threshold." Pl.'s MJAR at 17. In other words, Acuity represents that it believed all past performance references (both for the offeror and any subcontractors) had to meet the complexity threshold for offerors. However, if this was, in fact, Acuity's interpretation, Acuity has failed to show how it was prejudiced. As, "there is no presumption of prejudice when a protestor demonstrates irrationality in an agency decision[,]" *Sys. Stud. & Simulation*, 22 F.4th at 998, the burden remains on the protestor to show such prejudice. *See Bannum, Inc.*, 404 F.3d at 1353. Acuity needed to show "that there was a 'substantial chance' it would have received the contract award but for" the unstated evaluation criterion. *Id.* Given the facts, it seems as though that would be almost impossible. Acuity was rated "Very High Confidence" for the Past Performance factor, AR 4419, which is the highest rating for this factor, AR 1158–59. Acuity argues that if it had been able to submit a difference reference "it likely would have been deemed relevant and garnered Acuity a strength." Pl.'s MJAR at 19. But based on Acuity's admitted understanding of the provision, it is unclear to the Court (and Acuity failed to offer any evidence to support) how Acuity could submit another reference to garner a strength when it failed to submit references that comported with its alleged understanding of the provision to begin with. *See* Gov.'s MJAR at 22–24.[7] As the government informed the Court at oral argument, all of Summit's subcontractors met the higher offeror criteria for complexity, so Acuity was the only party to benefit from the changed criteria. *See* Tr. 85:3–85:7. Had Acuity argued that it submitted subcontractor references based on an understanding that the solicitation contained no requirement for subcontractor complexity to be relevant, this potentially could establish prejudice.[8] But it did not. As such, Acuity would still, if it had standing, fail to show that but for NASA's improperly changed evaluation criteria, it would have had a substantial chance at contract award.

Acuity's second alleged procurement error is to the evaluation of incumbency capture. Acuity asserts that it proposed a ███ incumbency capture rate and that it should have been awarded a strength for its ability to capture all incumbent staff. Pl.'s MJAR at 20–21. Acuity

---

scope of a given evaluation factor," *id.* at 20 (quoting *Harmonia Holdings Grp., LLC v. United States*, 153 Fed. Cl. 245, 255 (2021)). This is incorrect. While it may be the case that an agency does not have to describe every evaluation criterion for every subfactor, when a solicitation says that it will evaluate a subfactor based on the following criteria and then the agency changes those same criteria to something different it runs afoul of the FAR. Either NASA made a mistake in the complexity requirement that is obvious on its face, leading to a *Blue & Gold* issue, or it changed the evaluation criteria in conflict with the solicitation. Regardless of what explanation the government proffers, NASA changed the requirements for complexity.

[7] During oral argument, Acuity admitted that "[t]here's no doubt we benefit from the way they did [the past performance evaluation for subcontractor complexity] with the ones we submitted." Tr. 80:4–80:5. And the government highlighted Acuity's prejudice problem at oral argument as well: "[i]n fact, were Acuity Edge to prevail and we applied the offeror criteria, they would have lost two references. They would have lost a strength, and they would not have been found equal on this factor, and they actually would have dropped behind Summit on all three evaluation factors." Tr: 84:17–84:22. Thus, there is no harm to Acuity from this error. Absent a showing of harm specific to the alleged error, there is no prejudice to the protestor. *See Labatt Food Serv. v. United States*, 577 F.3d 1375, 1380 (Fed. Cir. 2009).

argues that one evaluator believed Acuity should have been awarded a strength, but the SEB "decided to take that strength away 'after discussion.'" *Id.* at 21 (quoting AR 4141). Acuity claims that this failure to document why the strength was taken away conflicts with APA-required documentation requirements. *Id*. at 21–22. Regardless of the accuracy of Acuity's argument—which is questionable—Acuity once again fails to demonstrate prejudice. The incumbency capture rating was not a standalone factor but rather was a subfactor of management and compensation approach, which was itself a subfactor of the mission suitability factor, AR 1103–08, which was to be "considered in tandem with the offeror's proposed total compensation plans." Gov.'s MJAR at 26. Acuity's own proposal makes this clear. Incumbent capture is discussed under "MCA-1(A) Total Compensation Plan (TCP) Overview[,]" "MCA-1(B) Sources of Staffing[,]" and "MCA-1(C) Staff Recruiting and Retention Approach[.]" AR 1250–51. While certainly a relevant criterion, Acuity failed to demonstrate how such a minor factor could make a large enough impact on the ratings to create prejudice to Acuity. Put another way, the Court is not convinced that but for the so-called "removal of the incumbency capture strength," Acuity would have had a substantial chance to receive the contract award. *See Bannum, Inc.*, 404 F.3d at 1353.

        More importantly, it is likely that if Acuity was given a strength for its proposed ███ capture rate, then Summit would have been given a strength for its proposed capture rate as well. Gov.'s MJAR at 26, 27 ("Summit may also have been awarded a strength on this basis, nullifying any comparative advantage that Acuity asserts."). First, Summit also effectively proposed a ███ incumbency capture rate: "*We capture all qualified incumbents* and provide the PM from Summit's own workforce. While our initial plan is to provide a PM through our own staff, *we are amenable to capturing the incumbent PM, if possible and desired by NASA*." AR 2871 (emphasis added). Second, even to the extent that this proposal cannot be read as proposing ███ incumbency capture, it definitely provides for ███ incumbency capture, and Acuity failed to demonstrate that its ███ incumbency capture rate was so far superior to a ███ capture rate that it either was worthy of a strength or that a ███ capture rate would not have also garnered the same strength. In short, Acuity failed to demonstrate prejudice on this point even assuming it had standing and could demonstrate error.

**CONCLUSION**

        For the reasons set forth above, Acuity has failed to establish that it has standing to bring the instant protest. Accordingly, Acuity's complaint is dismissed for lack of standing, and the Clerk shall enter **JUDGMENT** accordingly.

**IT IS SO ORDERED**.


                                        s/ Zachary N. Somers
                                        ZACHARY N. SOMERS
                                        Judge